1  ROB BONTA
   Attorney General of California
2  GIAM M. NGUYEN
   Supervising Deputy Attorney General
3  AUDRA C. CALL
   Deputy Attorney General
4  State Bar No. 252804
    300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013
    Telephone:  (213) 269-6611
6    Fax:  (916) 761-3641
    E-mail:  Audra.Call@doj.ca.gov
7  *Attorneys for Defendant*
   *J. Sao*
8
                IN THE UNITED STATES DISTRICT COURT
9
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
10
                        WESTERN DIVISION
11

12

13  **ROGELIO TREJO,**                    2:18-cv-03458-JVS-ADS

14                          Plaintiff,    **DECLARATION OF AUDRA C.**
                                          **CALL IN SUPPORT OF MOTION**
15        **v.**                          **FOR SUMMARY JUDGMENT**

16                                        Judge:       The Honorable Autumn
    **DR. MICHAEL BRANDON**                            D. Spaeth
17  **FREEMAN, et**                       Trial Date:  None assigned
                                          Action Filed: April 25, 2018
18
    **al.,**
19
                          Defendants.
20

21

22        I, Audra C. Call, make this declaration in support of Defendant's Motion for

23  Summary Judgment.

24        1.    I am a Deputy Attorney General in the Office of the Attorney General of

25  the State of California and I am admitted to practice law in the State of California

26  and before this Court.  I represent Defendant J. Sao in this action.  I have personal

27  knowledge of the facts attested herein.

28        2.    On April 14, 2021, after obtaining leave from this Court, I conducted the

                                    1

deposition of Plaintiff, who was an inmate incarcerated at Calipatria State Prison in Calipatria, California. The deposition was taken before a Certified Shorthand Reporter, and was transcribed.

3.    Attached hereto as Exhibit "1" are true and correct copies of the portions of Plaintiff's deposition transcript that are cited in Defendant's Statement of Undisputed Facts. For ease of reference, the cited sections have been highlighted.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 21, 2021 at Los Angeles, California.

_Audra C. Call_

LA2020604139
64553454.docx

# EXHIBIT 1

Atkinson Baker, a Veritext Company
www.depo.com

1                    IN THE UNITED DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    ROGELIO TREJO,                )        **CERTIFIED COPY**
                                   )
5              Plaintiff,          )
                                   )    Case No.
6         vs.                      )    2:18-cv-03458-JVS-ADS
                                   )
7    DR. MICHAEL BRANDON           )
     FREEMAN, et al.,              )
8                                  )
               Defendants.         )
9                                  )
                                   )
10                                 )
                                   )
11                                 )
                                   )
12   _____)

13

14

15         VIDEO CONFERENCE DEPOSITION OF ROGELIO TREJO

16                      APRIL 14, 2021

17

18

19

20   ATKINSON-BAKER, INC., A VERITEXT COMPANY
     (800) 288-3376
21   www.depo.com

22

23   REPORTED BY:  KARLA L. BEARD, CSR 13036

24   FILE NO.     AF027C1

25

Atkinson Baker, a Veritext Company
www.depo.com

1              IN THE UNITED DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    ROGELIO TREJO,                )
                                   )
5              Plaintiff,          )
                                   )    Case No.
6          vs.                     )    2:18-cv-03458-JVS-ADS
                                   )
7    DR. MICHAEL BRANDON           )
     FREEMAN, et al.,              )
8                                  )
               Defendants.         )
9                                  )
                                   )
10                                 )
                                   )
11                                 )
                                   )
12    _____)

13

14

15

16          Video Conference Deposition of ROGELIO TREJO,

17    taken on behalf of Defendant, commencing at 9:10 a.m.,

18    Wednesday, April 14, 2021, before Karla L. Beard,

19    Certified Shorthand Reporter 13036.

20

21

22

23

24

25

Atkinson Baker, a Veritext Company
www.depo.com

```
 1                    A P P E A R A N C E S:

 2
      For the Defendant:
 3
             DEPUTY ATTORNEY GENERAL
 4           BY: AUDRA CALL
                 Attorney at Law
 5           300 South Spring Street
             Suite 1702
 6           Los Angeles, California 90013
             (213) 897-5677
 7           (213) 897-5775 fax
             audra.call@doj.ca.gov
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1                        I N D E X

 2

 3     WITNESS:  ROGELIO TREJO

 4     EXAMINATION                              PAGE

 5          BY MS. CALL                           5

 6                      E X H I B I T S

 7     NUMBER              DESCRIPTION          PAGE

 8
       Exhibit A  Defendants' Notice of Deposition of
 9                Plaintiff Rogelio Trejo (CDCR No.
                  V53099) and Request for Production of
10                Documents                       14

11     Exhibit B  Second Amended Civil Rights Complaint
                  Pursuant to 42 U.S.C. § 1983    16
12
       Exhibit C  Complaint                       20
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson Baker, a Veritext Company
www.depo.com

1  too.  I had to file lawsuits under the same thing that

2  you're going through."

3    Q    Okay.  So I am going to scroll down a little bit,

4  and I am going to come to -- so I am going to page 10.

5  And I am going to scroll through these pages, Mr. Trejo.

6         And so I am scrolling through 10 of 20 of this

7  complaint, Exhibit C to the deposition.

8         And when I am referring to page numbers, I am

9  referring to the page numbers assigned by the ECF system

10  at the top of the --

11    A    I remember I exhausted all of my remedies right

12  there with that.

13    Q    Okay.  So the pages that I just scrolled through,

14  the 10 through 20, those are exhibits that were attached

15  to this complaint.

16         Do you understand that?

17    A    Yep; yes.

18    Q    Where -- where did the person who helped you with

19  this complaint get these documents?

20    A    From the prison.  Through the prison records.

21    Q    Did he specifically ask for them through the

22  prison, or did you have the documents and then give them

23  to him?

24    A    No.  I have to get them through prison records.

25  I can get them whenever I want.  I can get them through

Atkinson Baker, a Veritext Company
www.depo.com

1    the prison records.

2        Q     And so you provided these documents to the person

3    who was helping you with the lawsuit; correct?

4        A     Yes.

5        Q     And he attached them to the complaint on your

6    behalf?

7        A     Yes.

8        Q     Okay.  And as far as grievances that were filed,

9    do you have any other paperwork related to the grievance

10   that you filed regarding this issue other than what was

11   attached to the first complaint?

12       A     No.  That's everything.

13       Q     Okay.  And the handwriting on the grievance form

14   itself so that would be like page 12, 13, 14, 15, those

15   pages, that handwriting is that that same handwriting of

16   the inmate who was helping you do the complaint?

17       A     The first complaint?

18       Q     Yes.

19       A     Yes.

20       Q     Okay.  So going to the incident that actually

21   happened.

22             So my understanding is that you were out of your

23   cell with another inmate; correct?

24       A     Yes.

25       Q     Okay.  Tell me how that happened?  Why were you

Atkinson Baker, a Veritext Company
www.depo.com

1    immediately rushed me out.  They knew something was wrong.

2        Q    Did Dr. Freeman say anything to you about who had

3    referred you to them or anything like that?

4        A    Yeah.  He said the prison that -- "Dr. Sao at the

5    prison works, they referred you over here to me."  But I

6    told them, "How did I get here?  Who sent met to you?"

7            And he said, "The people at the prison referred

8    you over to me.  Don't panic.  I'm a good doctor.  I know

9    what I'm doing."

10           I said, "You're the doctor.  Go ahead.  Do what

11   you do."

12           Apparently, he didn't know what he -- he didn't

13   do it right, you know?

14       Q    Do you know what kind of a doctor he was?

15       A    He said he was a plastic surgeon.

16       Q    Okay.  Do you know if he like specialized in

17   dental surgery or anything like that?

18       A    He says he's fixed hundreds of jaws like this.

19   He's done plenty of them.  He said, "It's no problem.  I

20   can fix it."

21           I said, "All right.  Thank you."

22       Q    What did he tell you that you needed to have

23   done?

24       A    I needed like some screws, like a couple of

25   things and like a little inner something put in there, you

1    know?

2         I was like, "Okay.  That sounds fine.  Everything

3    sounds fine."

4         Q    Okay.  And then you actually had the surgery?

5         A    Yeah.  He put four screws right here (indicating)

6    and a little thing, and that was it.

7              He said, "You're good to go."

8         Q    And you said he put four screws right here, and

9    you're indicating your lower left jaw?

10        A    Yes.

11        Q    On the side?

12        A    Yes.

13        Q    And you had to undergo anesthesia and everything

14   like that?

15        A    Yes.

16        Q    So when you woke up, were you still at the

17   off-site hospital?

18        A    Yep. Yes.

19        Q    And how were you feeling when you woke up?

20        A    I didn't feel good at all immediately.  I knew

21   something was off.

22             I said, "Man, this feels pretty bad."

23             "Oh, you're fine.  You're fine."

24             They rushed me out immediately after surgery.  I

25   was like, "Bro, I just got out of surgery an hour ago."

1   the hospital?

2       A    Yes, to the doctors.  To Dr. Freeman and the

3   nurses, and the cop.  I was like, "Hey, this doesn't feel

4   right."

5           "Oh, you're fine.  You just got out of surgery.

6   Give it time to heal."

7           I said, "Okay."

8            So that's what I did, you know?

9       Q    And you said you tried to communicate that to the

10  cops, so you are talking about correctional officers?

11      A    All of them that were there.  I was trying to

12  communicate the best I could to them.  You know, "This

13  hurts."  "Like, it don't feel right."

14          And they are like, "Calm down.  You are healing.

15  Let it heal.  We will go from there."

16          I said, "But it feels off.  Like, it don't feel

17  right.  It's not sitting in there right.  It doesn't feel

18  like it is sitting right."

19          He said, "It will heal.  It will heal."

20          I am like, "Okay.  You are the doctor.  You know

21  more than me."  You know, "You are the professional here."

22      Q    Okay.  So you -- essentially, you said you were

23  taken back from the off-site hospital back to the

24  facility, the prison?

25      A    Uh-huh.

Atkinson Baker, a Veritext Company
www.depo.com

1       Q     Is that a "yes"?

2       A     Yes.

3       Q     And how long would you say it was after you woke

4   up from the surgery that you were transported back?

5       A     No more than a couple of hours, two, three hours.

6   They rushed me immediately.

7           I was like, "Bro, I am still spitting blood out

8   of my mouth and you guys want me to leave?  I am still

9   bleeding."

10          Even the nurse was like, "Man, you are rushing

11  taking him?"  She couldn't even believe it, but she

12  doesn't override the CDC, you know?

13      Q     You mean the nurse at the hospital?

14      A     Yeah, the nurse that was taking care of me.  She

15  was like, "Dang, he just came out of surgery."

16          But they were in a rush to rush me out of the

17  hospital.  Now, I see why.  The second surgery, they left

18  me there a whole week after surgery was complete.

19      Q     Did you have any -- like, any tests done after

20  you came out of the surgery?

21          Like, did they X-ray or anything like that?

22      A     No.  They didn't want to do X-rays or nothing.  I

23  was complaining until finally I couldn't do it no more.  I

24  had to do what I had to do.

25      Q     Okay.  So you get back to the prison.  Where do

Atkinson Baker, a Veritext Company
www.depo.com

1    you go at the prison?

2        A    To the infirmary, the CTC.

3        Q    The CTC?

4        A    Yeah, infirmary.  CTC infirmary.

5        Q    And is there actually housing there?

6        A    Yeah, they're like about the size of this little

7    room right here (indicating).

8        Q    And so you're actually housed in the CTC for a

9    period of time; is that correct?

10       A    Yeah, more than enough time.

11       Q    More than enough time for what?

12       A    For that kind of surgery.

13       Q    So how long were you -- how long did you stay at

14   the CTC?

15       A    Two months.  Probably, over two months.

16       Q    And when is the first time -- strike that.

17            When you got back to the prison, and you arrived

18   to CTC, who is the first person that you saw there that

19   was employed by CDCR as far as medical staff?

20       A    Oh, medical?

21       Q    Yes.

22       A    I got there late, so a nurse.  Probably, a nurse.

23   I got there late.

24       Q    When is the first time that you saw a doctor?

25       A    The next morning.  That's when I seen Dr. Sao.

Atkinson Baker, a Veritext Company
www.depo.com

1    And he's the one that told me that he's in charge of here,

2    the head doctor of the infirmary.

3         Q    And did you guys talk about the surgery and

4    everything?

5         A    Yeah.  Every day or every other day.  I was

6    speaking to them when I needed to.

7         Q    That first day, the first time that you met with

8    Dr. Sao, what did you tell him?

9         A    I told him, "Hey, my jaw don't feel right.  It

10   doesn't feel right."

11            "You're fine.  It's healing.  It's healing."

12            I am like, "Bro, I know how my jaw feels.  It

13   doesn't feel right, bro."

14            And he was like, "It's healing.  Give it time to

15   heal.  You are going to be okay."

16            "All right, then.  I'm going to be okay then."

17            And that's all he told me.  I couldn't get pain

18   medication or nothing for it.  All they gave me was

19   Tylenol and that was it.

20        Q    Okay.  So you said you weren't given any pain

21   medication except for Tylenol?

22        A    Yep.

23        Q    And how often did you see Dr. Sao when you were

24   in the CTC?

25        A    I see him every day or every day, or as much as I

Atkinson Baker, a Veritext Company
www.depo.com

1      A      Before, I get seen straight to the X-ray room in
2   the CTC in the dental.  I go to dental.
3      Q      Did you see a different doctor, a dentist?
4      A      No.  Dr. Sao was the main one controlling my
5   case.
6      Q      So you're saying Dr. Sao is the one that ordered
7   the X-rays?
8      A      Finally.
9      Q      Is that a "yes"?
10     A      Yes.
11     Q      Did you see any other doctor like a dentist while
12  you were there?
13     A      No.  No.  Just Dr. Sao.
14     Q      And then after you got these X-rays, did Dr. Sao
15  talk to you about the results?
16     A      After they knew it was messed up?
17     Q      Well, how did you know that they knew it was
18  messed up?
19     A      Through the X-rays when Dr. Sao took of me.
20  Through the X-rays, he knew immediately.  "Oh, man, it's
21  messed up."
22     Q      And that's what Dr. Sao said?
23     A      Yeah.  I said, "What do you mean?"  I told him,
24  "What do you mean?"
25            He said, "It's messed up, Bro.  I have to rush

Atkinson Baker, a Veritext Company
www.depo.com

1        I said, "Oh, man that's why I can't move it."
2  It's off.  And I could feel it.  It feels loose, and it
3  doesn't feel right.
4        Q    So what felt loose?  What was it that they said
5  was off?
6        A    The screws.  There were screws inside it.  And it
7  didn't feel right.  After they took the metal off, I could
8  move it.  Now, I can move it.  And then I could feel
9  something is not right.  I felt like popping noises like
10  it don't feel right.  And "I'm like, what's that?"
11       She's like, "Oh, that's loose.  Something is
12  loose in there."
13       Q    Okay.  And --
14       A    She said, "They didn't perform the surgery right
15  on you."
16       Q    And who was it that said that?
17       A    The nurse and Dr. Sao.  They are the only ones
18  there with me.
19       Q    Well, did you say there was a dentist there, too?
20       A    Oh, yeah, the dentist, but he was just sitting
21  there.  He wasn't involved in the situation.
22       Q    Do you remember who the dentist was?
23       A    No, I don't remember the dentist's name.  He was
24  irrelevant.  He was just there.
25       Q    Okay.  So after you got these X-rays, you said

Atkinson Baker, a Veritext Company
www.depo.com

1   Dr. Sao said something was wrong.  How soon after that
2   were you sent to the outside hospital again?
3        A    After Dr. Sao knew it was messed up?
4        Q    Yes.
5        A    Immediately.  He immediately knew right away he
6   had to send me out.  They rushed me out immediately.  I
7   mean, immediately.  "Back to the cell.  Change your
8   clothes, and let's go."
9             And I was like, oh, man, that was the first time
10  I've seen them do anything.
11            At that point, they knew the surgery was blown.
12  They can't leave me there with a messed up surgery.  They
13  are responsible for us.  They knew, man, the surgery is
14  blown.  They rushed me out immediately.
15            This is all happening like domino effect like,
16  boom, boom, boom, boom.  I am like, "Whoa."
17       Q    And so you -- were you taken in an ambulance to
18  the outside hospital?
19       A    No.  That time I went in a regular car.
20       Q    Okay.  And did you go to the same hospital or a
21  different hospital?
22       A    No.  He said, "We're not taking you to that
23  hospital anymore.  That hospital let me down.  We are
24  going to take you to another hospital.  We went to
25  Mercy Hospital."

Atkinson Baker, a Veritext Company
www.depo.com

```
 1        A    Like six weeks at CTC.

 2        Q    Okay.  So they actually took the wiring out at

 3   CTC?

 4        A    Yes.

 5        Q    And after they took the wiring out, so then your

 6   jaw was able to open again?

 7        A    A little bit.  Not completely.  Like, I couldn't

 8   eat a whole hamburger or nothing.  It was just like

 9   baby -- it was like little, you know?

10        Q    And that was because of what was going on with

11   your jaw?

12        A    No.  That's just normal.  When it's closed for so

13   long, and then it finally opens up, you have to gradually

14   work it again.  You have to gradually work that muscle.

15   It finally opens.  But I knew immediately before even that

16   occurred, I knew, immediately, man that it was -- it was

17   messed up.

18        Q    When you had your jaw wired up in the CT after

19   the first surgery, you weren't able to open your mouth

20   then for that six weeks or however it long for it to take

21   the wire out?

22        A    No.  It was shut.

23        Q    Okay.  So you weren't -- am I correct in saying

24   that you weren't able to open your mouth that whole time?

25        A    No, because it was shut.  It was closed.  It was
```

Atkinson Baker, a Veritext Company
www.depo.com

1   closed.  They did the surgery, so it was closed.

2       Q    But -- so I'm not asking my question right.

3            If -- am I correct in saying you couldn't open

4   your mouth?  Is that correct?

5       A    Yeah, I couldn't open it.

6       Q    Okay.

7       A    It's shut.  It's shut.  It's closed.

8       Q    Okay.  So essentially, you say they took the

9   wiring out when you were in the CTC before the second

10  procedure; correct?

11      A    Yes.  It's CTC.

12      Q    How long before the X-ray that they took at CTC

13  when they found there was a problem did they take that

14  wiring out?

15      A    How long did it take?

16      Q    How long before the X-ray did they take that

17  wiring out?

18      A    Oh, it's like six weeks.  It took like six weeks.

19  I had to take like six weeks with the wiring in.

20      Q    Right.  And then, at some point, you have an

21  X-ray which is where they said, oh, there's something

22  wrong; right?

23      A    Yes.  That test I had to do with refusing and

24  protest and go through what I had to go through just to

25  get the X-ray done.  But before that, they didn't want to

Atkinson Baker, a Veritext Company
www.depo.com

```
 1      Q    And when did you have the surgery from
 2  Dr. Freeman?
 3      A    I would say the next day, February 7th.
 4      Q    February 6th?
 5      A    I mean, 6.  6.  Yeah, 6.
 6      Q    And this is all in 2017; right?
 7      A    Yes.
 8      Q    Okay.  And your jaw is wired shut?
 9      A    Yes.
10      Q    Now, at some point, after Dr. Freeman did the
11  initial procedure, did you see Dr. Freeman again to have
12  hardware taken out?
13      A    Yes.  He was the one that took it off.
14      Q    Okay.  And where did you see Dr. Freeman?  Did
15  you see him at the prison, or did you see him at the
16  off-site hospital?
17      A    At the off-site, the off-site hospital whenever
18  it's at.
19      Q    Okay.  So at some point, you were transported
20  to -- was that San Joaquin did you say?
21      A    Yeah, in Bakersfield.
22      Q    At some point after you had that procedure
23  sometime later, a few weeks, you were then taken back to
24  San Joaquin in Bakersfield and you saw Dr. Freeman again?
25      A    Yes.
```

Atkinson Baker, a Veritext Company
www.depo.com

```
1      Q    He removed what?  He removed the wiring, or did
2   he remove other things, too?
3      A    That's it.  He just removed the wiring.
4      Q    The wiring from your jaw?
5      A    Yep.  Yeah.  The stuff that he put in, he took
6   out.  The wiring they put in, he took out.
7      Q    He didn't remove like, screws, or pins, or
8   anything like that?
9      A    No.  Because those are in inside of me, you know?
10  You have to go into surgery to get that out of me.
11     Q    So he just took the wiring stuff that was closing
12  your jaw?
13     A    Yes.
14     Q    Okay.  And how long would you say that was after
15  you had your first procedure?
16     A    That he took the wires off?
17     Q    Yes.
18     A    Like seven a half, eight weeks finally until it
19  was off completely.  That was the first time.
20     Q    Did he take any X-rays there at the off-site
21  hospital?
22     A    No.  That's why I told him.  I was even shocked.
23  I was like, "Bro, you aren't even going to check the
24  X-rays?"
25          He's like, "It's fine.  It looks good."
```

Atkinson Baker, a Veritext Company
www.depo.com

1           I said, "Bro, it doesn't feel like."
2           He's like, "It's real good. I can tell just
3    by" -- you know, I guess he touched or whatever he did.
4    He said, "Oh, it looks fine.  Everything looks good."
5       Q    Okay.  So after you got your jaw unwired by
6    Dr. Freeman at the off-site hospital, were you then
7    returned back to CTC?
8       A    Yeah.  Yes.  Dr. Sao is the only one that can
9    release me.  He is in control of me.
10      Q    What do you mean he is the only one who can
11   release you?  From where?
12      A    From CTC.  He's the doctor in control of the CTC.
13   As soon as he says I am clear to go then I'm clear to go.
14   He's the only one that can clear me.
15      Q    Did Dr. Sao order any kind of like, physical
16   therapy for your jaw or treatment after you returned from
17   having the hardware removed?
18      A    No.
19      Q    Did he order ice pack?
20      A    Ice packs?  On the first one or second one?
21      Q    After you came back from seeing Dr. Freeman and
22   he removed the hardware?
23      A    Ice packs.  He might have given me some ice
24   packs.  I don't remember ice packs, though, but he might
25   have.

Rogelio Trejo
April 14, 2021                                          63

Atkinson Baker, a Veritext Company
www.depo.com

```
 1         Now, if they scheduled, they didn't call me
 2    because I sure didn't get no schedule.
 3      Q     Did you ever go see the ophthalmologist while you
 4    were in there for CTC for any reason?
 5      A     I don't even know what that is.
 6      Q     Like an eye doctor?
 7      A     Oh, yeah.  Yep.  I had the messed up eye.  Yep.
 8    They messed up my eye from the Mace.
 9      Q     Okay.  And so you had to see an eye doctor at
10    some point while you were in CTC?
11      A     Yep.  Yes.
12      Q     And that was after you had had the hardware
13    removed from Dr. Freeman?
14      A     After -- yeah, I think it might've been.
15    Honestly, I'm not sure on that one.
16      Q     Okay.
17      A     But it was while the first surgery was still
18    messed up.  I would say, yep.  It was pretty fresh.
19    Because the eye was still messed up from all of that Mace.
20    They probably didn't want to treat me from all the Mace.
21    That was from all of the Mace that they -- they blast me
22    with all of that damn Mace.  I don't know why they Maced
23    me.  I wasn't even fighting back.  I didn't have an
24    opportunity to fight back.
25         So they are Macing a defenseless person, you
```

Atkinson Baker, a Veritext Company
www.depo.com

1   messed up.  It's messed up," they're like, "Oh, man, why

2   is he saying that?"  They have some kind of conscious

3   like, "Why does he keep saying that?"

4            Nobody wants to admit it's messed up.

5            And nobody wants to walk around with a messed-up

6   jaw all day.  So I'm like, "Oh, man, it's messed up."

7      Q    Do you know why saying -- if it's messed up, do

8   you know if they had any other information that there was

9   something wrong with what was going with your jaw other

10   than you saying that you think it was messed up?

11      A    No.  I mean, I don't know if they actually knew

12   personally, but I knew that I knew it was messed up.

13   Because they ask you, "How do you feel?  Do you feel fine?

14   What's wrong?"  And I'm telling them it's messed up, but

15   they refused to give me X-rays.  Why would you not just

16   X-ray me?  It'll be so simple just to X-ray me.

17      Q    Okay.

18      A    And they didn't want to X-ray me, man.  I'm like

19   repeatedly telling you over and over and over, "I need an

20   X-ray.  I need an X-ray."  And it's so simple to go take

21   an X-ray.  It's so simple and they didn't want to do it.

22      Q    Do you know why they didn't want to do it?

23      A    I don't know why.  I just got the feeling, a gut

24   feeling that they knew it was messed up somehow, and they

25   were just hoping that it got fixed or whatever the reason

Atkinson Baker, a Veritext Company
www.depo.com

1    was it was miraculously fixed when they did it.

2        Q    Why do you think they would -- why do you think,

3    as you're saying that they were hoping that it would just

4    miraculously get fixed?

5            Why -- what motivation would they have for not

6    giving you an X-ray to your knowledge?

7        A    Because they don't want to rush me out to get

8    another surgery because they know they're going to have to

9    go through the whole thing again, and people might get in

10   trouble.

11       Q    Okay.  So you have the hardware removed by

12   Dr. Freeman.  And then, at some point after that, you had

13   this X-ray that said there was something wrong; right?

14       A    Uh-huh.

15       Q    Yes?

16       A    Yes.

17       Q    How long between the two of those

18   incidents -- how long between the time that Dr. Freeman

19   took the hardware out to the time you got that X-ray, how

20   long was that?

21       A    Like ten days.

22       Q    Ten days.  Okay.  And immediately after they saw

23   the issue on the X-ray, they sent you off-site to

24   Dr. Norris?

25       A    Immediately.  Immediately.  Like quick.

FILED
CLERK, U.S. DISTRICT COURT

APR 25 2018

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

_ROGELIO TREJO_
(Name of Plaintiff)

_C3-#237_____, PO BOX 4610_
(Address of Plaintiff)

_LANCASTER, CA, 93539_

vs.

_DR. MICHAEL BRANDON FREEMAN,_

_RN GONZALEZ, DR. SAO, (3)_

_JOHN DOE NURSES, (4) JOHN DOE DOCTORS_
(Names of Defendants)

_LA18CV03458-JVS(SS)_
(Case Number)

COMPLAINT

I. Previous Lawsuits:

A. Have you brought any other lawsuits while a prisoner.  ☐ Yes   ☒ No

B. If your answer to A is yes, how many?: ___N/A___ Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper using the same outline.)

1. Parties to this previous lawsuit:

Plaintiff _____N/A_____

Defendants _____N/A_____

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983

3
Appendix 15-A, page 11

**EXHIBIT**

Ex. C Rogelio Trejo 4/14/21

(1)

Rev'd 5/99

RECEIVED
CLERK, U.S. DISTRICT COURT

APR 23 2018

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

2. Court (if Federal Court, give name of District; if State Court, give name of County)

*N/A*

3. Docket Number _____ *N/A* _____

4. Name of judge to whom case was assigned _____ *N/A* _____

5. Disposition (For example: Was the case dismissed? Was it appealed? Is it still pending?)

*N/A*

6. Approximate date of filing lawsuit _____ *N/A* _____

7. Approximate date of disposition _____ *N/A* _____

II. Exhaustion of Administrative Remedies

A. Is there a grievance procedure available at your institution? ☒ Yes ☐ No

B. Have you filed a grievance concerning the facts relating to this complaint?

If your answer is no, explain why not _____ *N/A* _____ ☒ Yes ☐ No

C. Is the grievance process completed? ☒ Yes ☐ No

III. Defendants

(In Item A below, place the full name of the defendant in the first blank, his/her official position in the second blank, and his/her place of employment in the third blank. Use item B for the names, positions and places of employment of any additional defendants.)

A. Defendant *MICHAEL BRANDON FREEMAN* is employed as *A MEDICAL DOCTOR UNDER CONTRACT WITH CDCR* at *SAN JOAQUIN COMMUNITY HOSPITAL*

B. Additional defendants *RN GONZALEZ IS EMPLOYED AS A REGISTERED NURSE AT KERN VALLEY STATE PRISON. DR. SAO IS EMPLOYED AS A MEDICAL DOCTOR AT KERN VALLEY STATE PRISON. THE (3) JOHN DOE NURSES AND (2) JOHN DOE DOCTORS ARE EMPLOYED AT KERN VALLEY STATE PRISON. (2) JOHN DOE DOCTORS ARE EMPLOYED AT LANCASTER STATE PRISON. ALL DEFENDANTS ARE BEING SUED IN THEIR INDIVIDUAL AND PROFESSIONAL CAPACITIES.*

4

Appendix 15-A, page 12

( 2 )

IV. Statement of Claim

(State here as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach extra sheets if necessary.)

(SEE ATTACHED)

V. Relief

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

(SEE ATTACHED)

Signed this _____ day of _____, 20_____.

_____
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

_____          _____
(Date)                            (Signature of Plaintiff)

5

Appendix 15-A, page 13

(3)

# STATEMENT OF CLAIM

1) ON 2/5/17, PETITIONER TREJO WAS SEEN AT SAN JUAQUIN COMMUNITY HOSPITAL SUBJEQUENT TO AN ASSAULT AT KERN VALLEY STATE PRISON.

2) CT SCANS REVEALED BILATERAL MANDIBULAR FRACTURES, NONDISPLACED NASAL BONE FRACTURES AND A MEDIAL WALL RIGHT ORBITAL FRACTURE WITH ORBITAL EMPHYSEMA. (SEE EXHIBITS)

3) ON 2/6/17 A DOCTOR MICHAEL BRANDON FREEMAN CONDUCTED AN INTERMAXILLARY FIXATION SURGERY, AND AN OPEN REDUCTION INTERNAL FIXATION OF COMPLEX BILATERAL MANDIBULAR FRACTURE BY WAY OF MULTIPLE APPROACH. (SEE EXHIBITS)

4) IMMEDIATELY FOLLOWING THE SURGERY AND CONTINUOUSLY AFTERWARD, PETITIONER TREJO SUFFERED AN EXCESSIVE AND INTENSE AMOUNT OF PAIN AND REPEATEDLY INFORMED MEDICAL OFFICIALS OF THIS FACT VIA HEALTH CARE REQVESTS (CDCR 7362).

5) ON 3/14/17 THE METAL WAS REMOVED FROM TREJOS MOUTH VIA SURGICAL PROCEDURE.

6) OVER (3) THREE WEEKS LATER, TREJO WAS SEEN BY A DENTIST AT KERN VALLEY STATE PRISON DUE TO HIM BEING OVERCOME BY INTENSE PAIN. HE WAS FOUND TO HAVE A NONUNION LEFT MANDIBULAR FRACTURE AS WELL AS SWELLING AND OVER BITING. ON 4/5/17 TREJO WAS RUSHED TO MERCY HOSPITAL IN BAKERSFIELD DUE NOT ONLY TO THE FRACTURE BUT TREJOS INABILITY TO EAT, SLEEP OR PERFORM THE BASIC NECESSITIES OF LIFE. (SEE MEDICAL NOTES IN EXHIBITS.)

7) ON 4/6/17, DR. OLENA NORRIS DDS HAD TO PERFORM A REMOVAL OF THE HARDWARE FROM THE LEFT MANDIBULAR ANGLE,

A REMOVAL OF THE TOOTH #17 IN LINE OF THE FRACTURE, A CLOSED REDUCTION, MAXILLOMANDIBULAR FIXATION WITH APPLICATION OF THE HYBRID SYNTHES ARCH BARS AND ELASTICS, AND AN OPEN REDUCTION, INTERNAL FIXATION OF THE LEFT MANDIBULAR ANGLE FRACTURE VIA TRANSCERVICAL APPROACH. THIS WAS A DIRECT RESULT OF THE VERY POOR AND SUBSTANDARD SURGERY CONDUCTED BY DR. FREEMAN AT SAN JUAQUIN COMMUNITY HOSPITAL.

8) IN THE PRELIMINARY REPORT FROM DR. NORRIS, SHE IS VERY CLEAR THAT DR. FREEMAN WAS RESPONSIBLE FOR DRILLING THROUGH MY WISDOM TOOTH, WHICH RESULTED IN ITS LOSS, OUT OF NECESSITY TO FACILITATE CORRECTING HIS SHOCKINGLY SUBPAR SURGERY. SHE FURTHER DICTATES THAT "I REMOVED THE CHAMPY PLATE, WHICH WAS SECURED WITH (4) SCREWS. ALL OF THESE SCREWS WERE LOOSE..." (SEE EXHIBITS)

9) THE REPORTS BY DR. NORRIS, WHO IS A DOCTOR IN GOOD STANDING AMONGST THE MEDICAL COMMUNITY, MAKE IT CLEAR ON ITS FACE, THAT DR. FREEMANS SURGERY AND MEDICAL PRACTICES FALL FAR BELOW CONTEMPORARY STANDARDS OF DECENCY AMONGST PROFESSIONALS IN THE MEDICAL COMMUNITY. NO DOCTOR WOULD LEAVE A PATIENT POST OPERATIVE AND DISCHARGED FROM THEIR CARE WITH WHAT WAS REPORTED BY DR. NORRIS AS "MALOCCLUSION, LOOSE HARDWARE IN LEFT MANDIBULAR FRACTURE, NON-UNION LEFT MANDIBULAR FRACTURE, TOOTH #17 IN LINE OF FRACTURE, PARESTHESIA AND PAIN LEFT MANDIBLE". FURTHER, IN COMPARING THE CURRENT STATE OF PETITIONER TREJOS INJURY WITH HIS

PRE OPERATIVE STATE ON 2/5/17, IT IS APPARENT THAT DR. FREEMANS DELIBERATE INDIFFERENCE AND NEGLIGENCE INFLICTED FURTHER HARM TO TREJO. AT NO POINT WAS THERE A NON UNION FRACTURE IN THE LEFT MANDIBULAR. IN FACT, PRELIMINARY REPORTS FROM SAN JOAQUIN COMMUNITY HOSPITAL CLARIFY THAT THE "FRACTURE THROUGH THE ASCENDING RAMUS OF THE LEFT MANDIBLE" IS "MILDLY DISPLACED". FOR A MEDICAL PROFESSIONAL TO APPROACH A PROCEDURE FOR A PATIENT WITH A "MILDLY DISPLACED" FRACTURE AND IN THE END LEAVE HIM WITH A "NON-UNION" FRACTURE IS NOT ONLY A DISPLAY OF SHOCKINGLY INADEQUATE TREATMENT, BUT IS ALSO NEARLY CRIMINAL IN NATURE AS THERE WAS A WRECKLESS DISREGARD FOR EVEN THE MOST MINIMAL REQUIREMENTS OF NOT ONLY HIS EXPECTED RESPONSE TO TREJOS SERIOUS MEDICAL NEEDS, BUT ALSO A CALLOUS DISREGARD FOR HIS MORAL OBLIGATIONS UNDER THE WEIGHT OF THE HIPOCRATIC OATH HE IS SWORN TO UPHOLD. DR. FREEMAN BLATANTLY INJURED AND ASSAULTED PETITIONER TREJO. THAT SAME SURGERY WITH THE SAME LEVEL OF MALPRACTICE WOULD NEVER HAVE BEEN INFLICTED UPON A CITIZEN IN THE COMMUNITY WHO WAS A NON-PRISONER, AND THEREFORE WAS INTENTIONALLY IMPOSED UPON TREJO WITH A PRECONCIEVED INTENTION TO "BOTCH" A SURGERY BECAUSE TREJO IS A PRISONER.

10) THROUGHOUT THE DURATION OF THE AFORCMENTIONED FOLLOWING THE SURGERY ON 2/6/17, PETITIONER TREJO IMMEDIATELY BEGGED RN C. GONZALEZ UPON RETURN TO KERN VALLEY STATE PRISON, TO ORDER AN X-RAY OR HAVE THE PRISON DOCTOR DO AN EVALUATION TO ENSURE

DR. FREEMAN DID A CORRECT JOB, BASED ON THE FACT THAT THE PAIN WAS OVERWHELMING AND UNBEARABLE. IT WAS OBVIOUS TO TREJO THAT SOMETHING WAS HORRIBLY WRONG. RN GONZALEZ REFUSED TO ACCESS A DOCTOR FOR TREJO. INSTEAD, RN GONZALEZ TRIAGED TREJO, SENT HIM BACK TO HIS CELL AND HAD A DR. SAO SIGN OFF ON THE "RETURN TO CUSTODY" PAPERWORK. TREJO ALSO INFORMED (3) JOHN DOE NURSES AND (2) JOHN DOE DOCTORS AT KERN VALLEY STATE PRISON, AND (2) JOHN DOE DOCTORS AT LANCASTER STATE PRISON THAT HE IS IN OVERWHELMING PAIN. HE COULD AND STILL CANNOT PERFORM THE DAILY NECESSITIES OF LIFE SUCH AS EATING, DRINKING, TALKING ETC. WITHOUT SUFFERING A GREAT DEAL OF PAIN.

   (11) TREJO HEREBY ASSERTS THAT DR. FREEMAN CLEARLY VIOLATED HIS 8TH AMENDMENT PROTECTIONS AGAINST CRUEL AND UNUSUAL PUNISHMENT, AND ACTED WITH DELIBERATE INDIFFERENCE TO HIS SERIOUS MEDICAL NEEDS. THE SUPREME COURT CLARIFIED IN THE ESTELLE V. GAMBLE COURT (429 US 97) THAT "THE EXISTENCE OF AN INJURY THAT A REASONABLE DOCTOR OR PATIENT WOULD FIND IMPORTANT AND WORTHY OF COMMENT OR TREATMENT, THE PRESENCE OF A MEDICAL CONDITION THAT SIGNIFICANTLY AFFECTS AN INDIVIDUALS DAILY ACTIVITIES; OR THE EXISTENCE OF CHRONIC AND SUBSTANTIAL PAIN" MEET THE REQUIREMENTS OF 8TH AMENDMENT CANON. WHEN DR. FREEMAN DISCHARGED TREJO WITHOUT AN X-RAY OR CT SCAN THUS FAILING TO SEE THE MANGLED METAL, LOOSE SCREWS AND NON UNION FRACTURE HE INFLICTED, HE ACTED WITH DELIBERATE INDIFFERENCE TO TREJOS SERIOUS MEDICAL NEEDS. FURTHER, TREJO CONTENDS THAT

1  DR. FREEMAN ACTED WITH MEDICAL NEGLIGENCE AND MALPRACTICE,
2  AND THEREFORE VIOLATED STATE TORT LAW. IT IS REQUESTED
3  THAT UNDER RES JUDICATA, THIS HONORABLE COURT HEAR
4  BOTH STATE AND FEDERAL CLAIMS ENJOINED

5      12) TREJO HEREBY ASSERTS THAT RN. GONZALES ACTED
6  WITH DELIBERATE INDIFFERENCE TO TREJOS SERIOUS MEDICAL
7  NEEDS BY FAILING TO ACT WHEN TREJO INFORMED HER OF THE
8  MANGLED METAL CAUSING OVERWHELMING PAIN. RN GONZALEZ
9  FAILED TO ACCESS A DOCTOR THUS ADDITIONALLY ACTING WITH
10 NEGLIGENCE UNDER STATE TORT LAW.

11     13) DR. SAO ACTED WITH NEGLIGENCE IN FAILING TO
12 PERSONALLY OBSERVE TREJO AND HAD HE, TREJO COULD HAVE
13 INFORMED HIM OF THE CRUEL AND WANTON INFLICTION OF PAIN
14 HE SUFFERED.

15     14) IT IS ASSERTED THAT THE (2) JOHN DOE NURSES AND
16 (2) JOHN DOE DOCTORS AT KERN VALLEY STATE PRISON ACTED
17 WITH DELIBERATE INDIFFERENCE TO TREJOS SERIOUS MEDICAL
18 NEEDS BY FAILING TO RESPOND NOR LOOK INTO TREJOS PLEADS
19 FOR EVALUATION OR HELP TO EVALUATE THE SOURCE OF HIS PAIN
20 FOR OVER (3) WEEKS WHICH AMOUNTS TO 8TH AMENDMENT
21 VIOLATIONS. NO ONE ATTEMPTED TO TREAT THE PAIN, X-RAY OR CT
22 SCAN THE SURGICAL SITE, NOR SEND TREJO BACK TO THE HOSPITAL.
23 INSTEAD THEY IMPLIED THAT TREJO WAS "MANIPULATING" STAFF
24 OR FABRICATING A CONDITION. IT WASN'T UNTIL TREJO WAS
25 FINALLY SEEN BY A DENTIST THAT HE HAD THE DAMAGE
26 DISCOVERED AND WAS RUSHED TO A HOSPITAL. THESE (4) DOES
27 ALSO ACTED WITH NEGLIGENCE THUS VIOLATING STATE TORT
28 LAW.

15) IN THE SAME MANNER AS THE AFOREMENTIONED, THE ISSUE IS ON GOING AND TREJO HAS SUFFERED PERMANENT DAMAGE AND APPARENT UNDIAGNOSED ISSUES WHICH TO DATE HAVE NOT BEEN LOOKED INTO. NOR HAS HIS PAIN BEEN TREATED. HE HAS NOTIFIED THE (2) JOHN DOE DOCTORS AT LANCASTER STATE PRISON AND THEY HAVE ACTED WITH DELIBERATE INDIFFERENCE TO HIS SERIOUS MEDICAL NEEDS, THUS VIOLATING HIS 8TH AMENDMENT PROTECTIONS. THEY HAVE FURTHER ACTED WITH NEGLIGENCE VIOLATING STATE TORT LAW.

RELIEF

PETITIONER TREJO PRAYS THIS HONORABLE COURT WILL GRANT THE FOLLOWING RELIEF:

1) PUNITIVE, COMPENSATORY AND NOMINAL DAMAGES IN THE AMOUNT OF $1,000,000 (ONE MILLION DOLLARS) FOR VIOLATIONS TO HIS 8TH AMENDMENT RIGHTS AND VIOLATIONS OF STATE LAW.

2) INJUNCTIVE RELIEF IN THE FORM OF PROPER ACCESS TO SPECIALISTS, DOCTORS AND NURSES WHO WILL PROFESSIONALLY EVALUATE, DIAGNOSE AND TREAT THE SUBSEQUENT DAMAGE THAT TREJO CONTINUALLY SUFFERS.

3) FURTHER RELIEF AS THE COURT SEES FIT.

PAGE 9 OF 9



CALIFORNIA CORRECTIONAL

# HEALTH CARE SERVICES



### Headquarters' Level Response

**Closing Date:**   MAR 0 8 2018

**To:**   TREJO, ROGELIO (V53099)
California State Prison – LA County
P.O. Box 4670
Lancaster, CA 93539-4670

**From:**   California Correctional Health Care Services
Health Care Correspondence and Appeals Branch
P.O. Box 588500
Elk Grove, CA 95758

**Tracking #:**   LAC HC 17000263

This health care grievance appeal was reviewed by Health Care Correspondence and Appeals Branch staff on behalf of the Deputy Director, Policy and Risk Management Services. All submitted information has been considered.

## HEALTH CARE GRIEVANCE APPEAL SUMMARY:

In your CDCR 602 HC, Health Care Grievance, received on November 27, 2017, you explained the decision, action, condition, omission, policy or regulation that has had a material adverse effect upon your health and welfare for which you seek remedy:

| | Issue | Description |
|---|---|---|
| **Issue:** | Administrative ( Monetary Compensation ) | Injunctive relief and monetary compensation in the form of punitive, compensatory and nominal damages. |

## RULES AND REGULATIONS:

The rules governing these issues are:  California Code of Regulations, Title 15; Inmate Medical Services Policies and Procedures; and the Department Operations Manual.

## HEADQUARTERS' LEVEL DISPOSITION:

[X]   No intervention.

[ ]   No further intervention.

[ ]   Intervention.

This decision exhausts your administrative remedies.

Your health care grievance with attachment(s), health record, and all pertinent departmental policies and procedures were reviewed.

---

Note 1: The Headquarters' Level Review is based on records available as of the date the Headquarters' Level Response is signed by the reviewing authority.
Note 2: The Closing Date reflects the closed, mailed/delivered date of the health care grievance.

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

P.O. Box 588500
Elk Grove, CA  95758

California Correctional Health Care Services strives to provide constitutionally adequate medical care for all California inmates. While the focus is on the adequacy of current and prospective care, due consideration is also given to allegations of inadequacies or lapses in past care. California Correctional Health Care Services includes the appropriate personnel and organizational functions to review such information and to take corrective action as may be warranted. Your concerns and issues have been taken into consideration and sent to the proper entities for appropriate review and/or action. Any such internal reviews and resulting actions are considered protected by law as confidential.

Monetary compensation is outside the jurisdiction of the health care grievances process.

It is not appropriate to expand the health care grievance beyond the initial issue(s). The Health Care Correspondence and Appeals Branch has the discretion whether to address new issues; it has been determined the new issue(s), *pain management*, not included in the originally submitted CDCR 602 HC, Health Care Grievance, will not be addressed at the headquarters' level per California Code of Regulations, Title 15, Section 3087.5(i).

If you have additional dental or health care needs, you are advised to utilize the CDC 7362, Health Care Services Request Form, process to access health care services in accordance with California Correctional Health Care Services policy.

While the health care grievance process is a means of setting forth your health care concerns, it is not a substitute for direct communication about your health with your medical care providers. You are encouraged to continue your care with your assigned medical care providers and share with them new or additional clinical information about your conditions that you believe may affect your care. However, California law directs your medical care providers to offer and provide only the care they determine to be currently medically necessary for you, in accordance with appropriate policies and procedures. Previous orders from other medical facilities or staff, input from medical consultants, and/or your own personal preferences may be considered, but do not control the professional judgment of your current medical care providers.

**DIRECTIVE:**
No intervention is required by the institution.

for _____                          03/06/18
S. Gates, Chief                                          Reviewed and Signed Date
Health Care Correspondence and Appeals Branch
Policy and Risk Management Services
California Correctional Health Care Services

---

Note 1: The Headquarters' Level Review is based on records available as of the date the Headquarters' Level Response is signed by the reviewing authority.
Note 2: The Closing Date reflects the closed, mailed/delivered date of the health care grievance.

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

P.O. Box 588500
Elk Grove, CA 95758

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE**
CDCR-0602 HC (Rev. 06/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 1 of 2

| STAFF USE ONLY | Expedited? | ☐ Yes | ☑ No | Institution: LAC HC | Tracking #: M000263 |
|---|---|---|---|---|---|

J Parra RN
HCSP / LAC
Staff Name and Title (Print)   Signature   Date 10-11-17

If you think you have a medical, mental health or dental emergency, notify staff immediately. If additional space is needed, only one CDCR 602 HC A Health Care Grievance Attachment will be accepted. You must submit this health care grievance to the Health Care Grievance Office for processing. Refer to California Code of Regulations (CCR), Title 15, Section 3087 for further guidance with the health care grievance process.

Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First, MI): TREJO, ROGELIO | CDCR #: V53099 | Unit/Cell #: C-2-226L |
|---|---|---|

**SECTION A:** Explain the decision, action, condition, omission, policy, or regulation that has had a material adverse effect upon your health and welfare for which you seek administrative remedy.

THE FOLLOWING APPEAL IS MEANT TO ADDRESS A SEVERE DEPRIVATION OF RIGHTS AFFORDED TO ME
BY 8TH AMENDMENT PROVISIONS, STATE AND FEDERAL GUIDELINES FOR MEDICAL TREATMENT AND STATE LAW.
SPECIFICALLY, ON 9/11/17 I WAS TAKEN TO BAKERSFIELD HOSPITAL TO SEE A DR. NORRES, EMPLOYED UNDER
CDCR CONTRACT. THIS DOCTOR INFORMED ME THAT THE SCREWS IN MY MOUTH ARE LOOSE, THAT EXCESSIVE
METAL WAS LEFT IN MY MOUTH AND THAT THE SURGERY I RECIEVED WAS OF SHOCKINGLY POOR QUALITY.
THIS BEING IMPOSED UPON ME HAS LEFT ME IN EXTREME PAIN. ON THE SAME TOKEN THIS INJURIES
ONGOING. I HAD RECIEVED SURGERY AT SAN JUAQUIN HOSPITAL BY DR. FREEMAN. THE SURGERY

*If you need more space, use Section A of the CDCR 602 HC A*

☐ Supporting Documents: Refer to CCR 3087.2. List supporting documents attached:

☒ No, I have not attached any supporting documents. Reason: ALL DOCUMENTS ARE ON RECORD.

| Grievant Signature: X | Date Submitted: 10/8/17 |
|---|---|

BY PLACING MY INITIALS IN THIS BOX, I REQUEST TO RECEIVE AN INTERVIEW AT THE INSTITUTIONAL LEVEL. RT

| HEALTH CARE GRIEVANCE REVIEW INSTITUTIONAL LEVEL: Staff Use Only | Is a CDCR 602 HC A attached? ☐ Yes ☐ No |
|---|---|

This grievance has been:

☐ Rejected (See attached letter for instruction): Date: _____ Date: _____

☐ Withdrawn (see section C)

☑ Accepted   Assigned To: Dental   Title: DENTIST   Date Assigned: 10/19/17   Date Due: 12/18/17

Interview Conducted? ☑ Yes ☐ No   Date of Interview: 10/27/17   Interview Location: C yard (dental)

Interviewer Name and Title (print): R. Parra, DDS   Signature: _____ Date: 10/27/17

Reviewing Authority Name and Title (print): R. Jackson   Signature: _____ Date: 11/3/17

| Disposition: See attached letter | ☐ Intervention | ☑ No Further Intervention | ☐ No Intervention |
|---|---|---|---|

*If dissatisfied with Institutional Level Response, complete Section B.*

HCGO Use Only: Date closed and mailed/delivered to grievant:   NOV 14 2017

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: |
|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☐ Patient asked questions |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ Patient summed information |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: |
| ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached* ☐ Reached |
| ☒ Not Applicable | ☐ Other* | *See chrono/notes |

4. Comments: Tabe score 9

RECEIVED
COMPLETED HCCAR
STAFF USE ONLY
NOV 14 2017
LAC-HCGO
MAR 08 2018
SEP 11 2017

Case 2:18-cv-03458-FVS-SS Document 71-3 04/25/18 Page 13 of 20 Page ID #:410

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE**
CDCR-0602 HC (Rev. 06/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 2 of 2

Tracking #: *LAC HC 17000263*

**SECTION B:** Health Care Grievance Appeal. If you are dissatisfied with the Institutional Level Grievance Response, explain the reason below (if more space is needed, use Section B of the CDCR 602 HC A), and submit the entire health care grievance package by mail for Headquarters' (HQ) Level health care grievance appeal review. Mail to: Health Care Correspondence and Appeals Branch, P.O. Box 588500, Elk Grove, CA 95758.

> I AM DISSATISFIED BASED ON THE FACT THAT NO CORRECTIVE
> ACTION WAS TAKEN TOWARD THIS EVEN WITH REGARDS TO
> REMEDIES IN PAIN MANAGEMENT, OR MEDICAL INJUNCTIVE RELIEF.
> ADDITIONALY, I MUST CONTINUE TO THE NEXT LEVEL IN ORDER
> TO EXHAUST ADMINISTRATIVE REMEDIES.

| Grievant Signature: | Date Submitted: 11-19-17 |
| --- | --- |

**HEALTH CARE GRIEVANCE APPEAL REVIEW HQ LEVEL: Staff Use Only**     Is a CDCR 602 HC A attached?  ☐ Yes  ☐ No

This grievance has been:

☐ Rejected (See attached letter for instruction):     Date:            Date:

☐ Withdrawn (see section C)

☐ Accepted

Interview Conducted?     ☐ Yes  ☐ No     Date of Interview:            Interview Location:

Interviewer Name and Title (print):            Signature:            Date:

| **Disposition: See attached letter** | ☐ Intervention | ☐ No Further Intervention | ☒ No Intervention |
| --- | --- | --- | --- |

*This decision exhausts your administrative remedies.*

HQ Use Only: Date closed and mailed/delivered to grievant:     MAR 0 8 2018

**SECTION C:**  Grievant requests to WITHDRAW health care grievance: I request that this health care grievance be withdrawn from further review. Reason:

| **Grievant Signature:** | **Date Submitted:** | |
| --- | --- | --- |
| **Staff Name and Title (Print):** | **Signature:** | **Date:** |

## STAFF USE ONLY

Distribution: Original - Returned to grievant after completed; Scanned Copy - Health Care Appeals and Risk Tracking System 2.0 (Do not place in central file or health record)

*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE ATTACHMENT**
CDCR-0602-HC A (06/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 1 of 2

**STAFF USE ONLY**

Institution:     Tracking #:

LAC HC 17000263

Attach this form to the CDCR 602 HC, Health Care Grievance, only if more space is needed. Only one CDCR 602 HC A may be used.
**Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First, MI): | CDCR Number: | Unit/Cell Number: |
|---|---|---|
| TREJO, ROGELIO | V53099 | C-2-226L |

**SECTION A** | Continuation of CDCR 602 HC, Health Care Grievance, Section A only (Explain the decision, action, condition, omission, policy or regulation that has had a material adverse effect upon your health and welfare for which you seek administrative remedy) :

WAS SUBSTANDARD AND OF NEGLIGENT QUALITY. AS A DIRECT RESULT OF THIS I HAVE CONTINUOUSLY SUFFERED UNDO PAIN FOR WEEKS WHICH FAILS TO MEET CONTEMPORARY STANDARDS OF DECENCY AMONGST THE MEDICAL COMMUNITY. SUBSEQUENTLY I HAD TO BE RUSHED TO AN EMERGENCY ROOM IN BAKERSFIELD HOSPITAL. I HAVE UNDERGONE AN INABILITY TO PERFORM THE DAILY NECESSITIES OF LIFE DUE TO BOTCHED SURGERIES, EXCESSIVE METAL, LOOSE SCREWS ETC. WHICH SHOULD HAVE BEEN REMOVED. DURING THIS ENTIRE HORRENDOUS EXPERIENCE, AN UNNECESSARY WANTON INFLICTION OF PAIN HAS BEEN IMPOSED THUS VIOLATING 8TH AMENDMENT PROTECTIONS AGAINST CRUEL AND UNUSUAL PUNISHMENT. IN THE SAME COURSE OF ACTION, FAILING TO PROPERLY ACT AND REMEDY THE BOTCHED SURGERIES, THEY ARE ACTING WITH DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS, FURTHER UNDERLYING 8TH AMENDMENT CANON. ADDITIONALLY, CCR 15 §3350 (b) 1, 4 AND 5 CLARIFY THAT BEING I CANNOT EAT, TALK OR DRINK PROPERLY AND MY DAILY NECESSITIES OF LIFE ARE NOT MET, MY RIGHTS ARE VIOLATED ON THE STATE LEVEL AS WELL. I SEEK INJUNCTIVE RELIEF AND MONETARY COMPENSATION IN THE FORM OF PUNITIVE, COMPENSATORY AND NOMINAL DAMAGES.

Grievant Signature: X _____     Date Submitted: 10/8/17

**SECTION B:** Continuation of CDCR 602 HC, Health Care Grievance Appeal, Section B only (Dissatisfied with Health Care Grievance Response) :

I AM DISSATISFIED BASED ON THE FACT THAT NO CORRECTIVE ACTION WAS TAKEN TOWARD THIS SITUATION. EVEN WITH REGARDS TO REMEDIES IN PAIN MANAGEMENT OR MEDICAL CORRECTIVENESS. ADDITIONALLY I MUST CONTINUE TO THE NEXT LEVEL IN ORDER TO EXHAUST ADMINISTRATIVE REMEDIES.

Grievant Signature: _____     Date Submitted: 11/19/17

RECEIVED
LAC
SEP 1 1 2017
OCT
YCGO

**COMPLETED**
NOV 14 2017
**LAC-HCGO**

RECEIVED
HCCAB
NOV 27 2017

STATE USE ON

COMPLETED
HCCAB
MAR 0 8 2018

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE ATTACHMENT**
CDCR-0602-HC A (06/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 2 of 2

Tracking #: *LAC HC 17000263*

| STAFF USE ONLY | Grievants <u>do not write</u> in this area. Grievance Interview Clarification: Document issue(s) clarified during interview |
|---|---|

Staff Name and Title: _____

Signature: _____     Date: _____

STAFF USE ONLY

**Distribution: Original** - Returned to grievant after completed, **Scanned Copy -** Health Care Appeals and Risk Tracking System 2.0 (Do not place in central file or health record)

*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*



# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



**Institutional Level Response**

**Closing Date:** NOV 1 4 2017

**To:** TREJO, ROGELIO (V53099)
C 002 2226001U
California State Prison – LA County
P.O. Box 4670
Lancaster, CA 93539-4670

**Tracking #:** LAC HC 17000263

## HEALTH CARE GRIEVANCE SUMMARY:

In your CDCR 602 HC, Health Care Grievance, received on October 11, 2017, you explained the decision, action, condition, omission, policy or regulation that has had a material adverse effect upon your welfare for which you seek remedy:

| | Issue | Description |
|---|---|---|
| **Issue:** | Administrative ( Monetary Compensation ) | Request to be compensated in the form of punitive, compensatory and nominal damages for claimed botched oral surgeries. |

## RULES AND REGULATIONS:

The rules governing these issues are: California Code of Regulations, Title 15; Inmate Medical Services Policies and Procedures; and the Department Operations Manual.

## INTERVIEW:

You were interviewed by Dr. Parra, staff dentist on October 27, 2017 regarding this health care grievance. During the interview, you were allowed the opportunity to fully explain your health care grievance issue(s).

## INSTITUTIONAL LEVEL DISPOSITION:

☐ No intervention.

☒ No further intervention.

☐ Intervention.

Your health care grievance is resolved.


RECEIVED
HCCAB
NOV 2 7 2017

---

Note 1: The Institutional Level Review is based on records available as of the date the Institutional Level Response is signed by the reviewing authority.
Note 2: The Closing Date reflects the closed, mailed/delivered date of the health care grievance.

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

P.O. Box 588500
Elk Grove, CA 95758

LAC HC 17000263
Page 2 of 2

Your health care grievance with attachment(s), health record, and all pertinent departmental policies and procedures were reviewed. These records indicate you have been experiencing pain due to jaw surgery you received at San Joaquin Hospital and you are requesting monetary compensation for damages. However, your request for monetary compensation is outside the scope of the grievance process.

R. JACKSON
Health Program Manager III
California State Prison – LA County

11/13/17
Reviewed and Signed Date

RECEIVED
HCCAB
NOV 2 7 2017

Note 1: The Institutional Level Review is based on records available as of the date the Institutional Level Response is signed by the reviewing authority.
Note 2: The Closing Date reflects the closed, mailed/delivered date of the health care grievance.

**HEALTH CARE SERVICES**

P.O. Box 588500
Elk Grove, CA 95758

Case 2:19-cv-03458-MEMF-ADS    Document 71-3    Filed 09/21/21    Page 44 of 47    Page
Case 2:18-cv-05458-FVS-SS    Document 1    Filed 04/25/18    Page 18 of 20    Page ID #:18
ID #:415

| FW-005 | Notice: Waiver of Court Fees (Superior Court) | *Clerk stamps date here when form is filed.* |

**(1)** Person who asked the court to waive court fees:

Name: ROGELIO TREJO V53099

Mailing address: CSP-LAC PO BOX 4670-"C3-"237

City: LANCASTER    State: CA  Zip: 93539

Phone number: N/A

**(2)** Lawyer, if person in (1) has one: *(name, address, phone number, e-mail, and State Bar number):*

N/A

_____

_____

_____

_____

*Fill in court name and street address:*

Superior Court of California, County of

**(3)** Your *Request to Waive Court Fees* was filed on *(date):*

4/18/18

*Court fills in case number when form is filed.*

Case Number:

Case Name:

**(4)** Your request is granted by operation of law because no court action was taken within five days after it was filed. A fee waiver is granted for the following court fees and costs *(Cal. Rules of Court, rule 3.55):*

- Filing papers
- Giving notice and certificates
- Sending papers to another court department
- Court fee for phone hearing
- Reporter's fee for attendance at hearing or trial, if reporter provided by the court
- Assessment for court investigations under Probate Code section 1513, 1826, or 1851
- Preparing, certifying, copying, and sending the clerk's transcript on appeal
- Holding in trust the deposit for a reporter's transcript on appeal under rules 8.130 or 8.834
- Making a transcript or copy of an official electronic recording under rule 8.835

- Making copies and certifying copies
- Sheriff's fee to give notice
- Court-appointed interpreter in small claims court

Date: _____  Clerk, by _____, Deputy

**Notice:** The court may order you to answer questions about your finances and later order you to pay back the waived fees. If this happens and you do not pay, the court can make you pay the fees and also charge you collection fees. If there is a change in your financial circumstances during this case that increases your ability to pay fees and costs, you must notify the trial court within five days. (Use form FW-010.) If you win your case, the trial court may order the other side to pay the fees. If you settle your civil case for $10,000 or more, the trial court will have a lien on the settlement in the amount of the waived fees. The trial court may not dismiss the case until the lien is paid.

## Clerk's Certificate of Service

I certify that I am not involved in this case and *(check one):*  ☐ A certificate of mailing is attached.

☐ I handed a copy of this notice to the party and attorney, if any, listed in (1) and (2), at the court, on the date below.

☐ This notice was mailed first class, postage paid, to the party and attorney, if any, at the addresses listed in (1) and (2), from *(city):* _____, California on the date below.

Date: _____  Clerk, by _____, Deputy

Judicial Council of California, www.courts.ca.gov
Revised July 1, 2015, Mandatory Form
Government Code, § 68634(f)            **Notice: Waiver of Court Fees**            FW-005, Page 1 of 1

Rogelio Trejo # V53099
California State prison —
P.O. Box 4610
Lancaster, CA. 93539

C # C3-4-232

C-3
CDCR STATE PRISON
GENERATED MAIL

C-3
CDCR STATE PRISON
GENERATED MAIL

C-3
CDCR STATE PRISON
GENERATED MAIL



United States District
Court Central District
of California
Office of the clerk
U.S. Courthouse, Room #G8
Los Angeles, CA. 90012

CLERK U.S. DISTRICT COURT
APR 2 8 2018
CENTRAL DISTRICT OF CALIFORNIA

VAUGHAN   89813                4/18/18   Vw

# CERTIFICATE OF SERVICE

Case Name: **Trejo, Rogelio v. Michael Freeman, et. al.**    No.    **2:18-cv-03458-JVS-ADS**

I hereby certify that on **September 21, 2021**, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DECLARATION OF AUDRA C. CALL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

I further certify that some of the participants in the case are not registered CM/ECF users. On **September 21, 2021**, I have caused to be mailed in the Office of the Attorney General's internal mail system, the foregoing document(s) by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days to the following non-CM/ECF participants:

Rogelio Trejo – CDCR# V53099
Calipatria State Prison
P.O. Box 5007
Calipatria, CA  92233
Pro Se

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on **September 21, 2021**, at Los Angeles, California.

Aida L. Paraiso
Declarant

Signature

LA2020604139
64555483.docx